**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
Case No. 22-CR-20083-KMW

**UNITED STATES OF AMERICA**

v.

**DAVID SCHIEFERLE,**

    **Defendant.**
_____/

**THE UNITED STATES' RESPONSE TO DEFENDANT'S**
**RULE 29 POST-VERDICT MOTION FOR JUDGMENT OF ACQUITTAL,**
**OR, IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL**

On March 8, 2022, a Grand Jury sitting in the Southern District of Florida returned an Indictment charging the Defendant, David Schieferle (the "Defendant"), with two counts of illegal importation of a firearm, in violation of Title 18, United States Code, Section 922(l), and one count of receipt or possession of a firearm which is not registered in the national firearms registration and transfer record, in violation of Title 26, United States Code, Section 5861(d). [DE 3].

Following a four-day trial before this Court, the Jury returned a guilty verdict to each count of the Indictment on December 8, 2022. [DE 101]. On December 22, 2022, the Defendant timely filed the instant Rule 29 Post-Verdict Motion for Judgement of Acquittal, or in the alternative, Motion for New Trial relying on two arguments: (1) the government did not introduce sufficient evidence to show the Defendant intended to use the so-called "fuel filters" or "solvent traps" as silencers and (2) the evidence extracted from the Defendant's government-issued iPhone was unreliable and should not have been admitted because it did not indicate if the data was viewed, and if so, the date it was viewed. [DE 115].

The Defendant's motion must be denied because his arguments are untenable and contrary to the overwhelming evidence presented at trial, which proved both that the Defendant intended to use

the "fuel filters" or "solvent traps" as silencers and that the data extracted from his cellphone was reliable.

## FACTS AND EVIDENCE PRESENTED AT TRIAL

On December 1, 2020, United States Customs and Border Protection ("CBP") officers intercepted a package containing ten (10) suspected firearm silencers shipped from China and destined for the Defendant's home address in Miami. The shipment's contents were mislabeled as "003 WIZ 24003 Solvent" in an apparent attempt to disguise the true contents of the package. [DE 105 at 1A – 1M].

On December 14, 2020, CBP officers intercepted a second package containing two (2) suspected firearm silencers, which were also shipped from China and destined for the Defendant's home address in Miami. The shipment's contents were also mislabeled as "Adapter" in another apparent attempt to disguise the true contents of the package. [DE 105 at 2A – 2C].

On December 18, 2020, law enforcement executed a search warrant at the Defendant's residence in Miami where they found a cache of firearms throughout the interior and in certain exterior storage areas of the property. [DE 105 at 6C at Bates No. DS_000613]. In addition to the twelve (12) silencers found in the December 1st and December 14th packages, agents found one (1) more silencer in a box marked "solvent tube" in the Defendant's living room, that contained the same lineaments as the silencers found in the packages. [DE 105 at 9A – 9B]. In all, law enforcement agents seized a total of thirteen (13) silencers between the two December packages and in the Defendant's home.

At trial, the government presented expert testimony from ATF Firearms Examination Officer ("FEO") Wayne Moser who testified that, based on his expert opinion, all 13 silencers (DE 105 at 1A-1J, 2A and 2B, and 9) were, in fact, silencers and not "fuel filters" or "solvent traps." *See* Exhibit

1, Tr. Wayne Moser, page 21, lines 17-19. Indeed, two (2) of the thirteen silencers, exhibits 1I and IJ[1], functioned as silencers without any modification. *Id.* at 21:6-11. The remaining eleven (11) silencers (DE 105 at 1A-1H, 2A-B, and 9) required only a 5-minute modification step—namely, passing a household drill through a pre-marked pilot hole in the center of the silencers—to make them fully functional.[2] *Id.* at 42: 5-16.

At the close of the trial, the salient questions for the jury were: (1) whether the Defendant knew the two functional silencers (1I and IJ) were silencers, and (2) whether the Defendant intended to use the remaining eleven silencers (1A – 1H, 2A-2B, and 9) as silencers. [DE 102 at 8-9]. Hence, to demonstrate the Defendant's knowledge and intent to use the silencers as silencers, the government relied in part on electronic evidence extracted from the Defendant's computer, which agents seized from his residence on December 18, 2020 [DE 105 at 10]. The government also introduced evidence from the Defendant's government-issued iPhone. [DE 105 at 21]. HSI Computer Forensic Agent ("CFA") Stuart Williams found the following, among other items, on the Defendant's computer, which the jury considered during their deliberations:

(a) an internet search for a YouTube video entitled "the cheapest suppressor" on November 3, 2020. [DE 105 at 11 and 12].

(b) A manual entitled the Poor Man's James Bond, which included silencer diagrams, information on silencers, a chapter entitled "Silencers from the Home Workshop," and instructions on how to fabricate silencers. [DE 105 at 17A-D, 18, 19].

(c) A manual entitled "Homemade guns and ammo." [DE 105 at 15].

---

[1] FEO Moser testified specifically about Exhibit 1I, which is a "monocore" silencer he test-fired and functioned "as is" without modification. Exhibit 1J was an identical "monocore" silencer.

[2] Under the definition of a silencer provided in Jury Instructions pursuant to 18 U.S.C. 921(a)(25), a silencer does not have to be fully functional to classify as a silencer. Indeed, the definition includes "any combination of parts, designed or redesigned, and ***intended for use in assembling or fabricating a firearm silencers or firearm muffler***..." [DE 102 at 8-9] (emphasis added).

(d) A bookmark for a manual on how to build an AR-15. [DE 105 at 22].

(e) Online search for a "Recover Tactical 20/20 Stabilizer Brace Conversion Kit." [DE 105 at 13].

(f) Web browser activity for how to ship items from China. [DE 105 at 20].

CFA Williams found similar evidence on the Defendant's government iPhone including:

(a) Photographs of silencers. [DE 105 at 32].

(b) A "meme" mocking the length of time it takes to obtain a tax stamp for a lawful firearm silencers. [DE 105 at 35A].

(c) E-mail with "price alert" for a Neiko 10169A Titanium Drill Bit set with center punch capable of drilling the necessary holes in the silencers shipped to the Defendant and the silencer found in the Defendant's home. [DE 105 at 36].

Another HSI agent also did a manual review of the cellphone and found orders for silencers from an online vendor, "Ali Express," made near the time the December 1st and December 14th packages (containing the silencers marked as 1A-1H) were shipped to the Defendant's residence. [DE 105 at 25-29]. Based on the foregoing, and additional evidence presented at trial, the Jury returned a guilty verdict to all counts of the Indictment. [DE 104].

In spite of this, the Defendant now asks the Court to set aside the jury's verdict alleging: (1) the government did not introduce sufficient evidence to show the Defendant intended to use the so-called "fuel filters" or "solvent traps" as silencers and (2) the evidence extracted from the Defendant's government iPhone is unreliable and should not have been admitted because the report does not indicate if the data was viewed, and if so, the date it was viewed. [DE 115].

## STANDARD OF REVIEW

To decide a post-trial motion for judgment of acquittal under Fed. R. Crim. P. 29, the Court must evaluate whether a reasonable trier of fact could find that the evidence established guilt beyond

a reasonable doubt when all the evidence is viewed in the light most favorable to the government. *United States v. Williams*, 390 F.3d 1319, 1323 (11th Cir. 2004); *See also United States v. Grigsby*, 111 F.3d 806, 833 (11th Cir. 1997). Importantly, all reasonable inferences and credibility choices must be drawn in favor of the jury's verdict. *United States v. Gianni*, 678 F.2d 956, 959 (11th Cir. 1982).

**ARGUMENT AND MEMORANDUM OF LAW**

Even in the face of the foregoing mountain of evidence, the Defendant remains inexorable. Despite the jury's verdict, he is intransigent in his position that he committed no crime and that the silencers were innocent items. Unwaveringly, in the instant motion he persists: (1) the government did not introduce sufficient evidence to show he intended to use the so-called "fuel filters" or "solvent traps" as silencers. In tandem, he argues that (2) the data extracted from this iPhone was unreliable and should not have been admitted. Both of these arguments are unfounded in fact and law.

**I.      The government introduced more than sufficient evidence for a reasonable trier of fact to find the Defendant intended to use the so-called "fuel filters" or "solvent traps" as silencers.**

Turning to the Defendant's arguments, he begins by positing that the government failed to provide any real evidence the Defendant's intended to use the silencers as silencers. This is hardly true. Contrary to the Defendant's bare assertions, the testimony of FEO Moser, coupled with the data found on the Defendant's electronic devices, constitute more than sufficient evidence for a reasonable trier of fact to determine that the Defendant intended to use the items as silencers, especially when all reasonable inferences and credibility choices are drawn in favor of the jury's guilty verdict. The Defendant provided a series of creative arguments in his motions and at trial as to how the silencers were innocent items like "solvent traps" or "fuel filters," but as the Defendant aptly points out, to withstand a Judgment of Acquittal, "it is not necessary for the evidence to exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *United Garcia*, 447 F.3d 1327, 1334 (11th Cir. 2006). In fact, a jury's verdict cannot be

overturned if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt. See *United States v. Pearson*, No. 17-CR-80080, 2018 WL 11000698, at *1 (S.D. Fla. Apr. 5, 2018).

To begin, the testimony of FEO Moser established that all 13 silencers (1A-1J, 2A-B, 9) introduced at trial are, in fact, silencers. Ex. 1 at 26-27; 29:13-15. He explained that silencers, like each of those introduced in this case, have essential features and characteristics which include an outer tube, end caps, and something in the middle that helps reduce the sound of the shot as the bullet passes through the firearm. *Id.* at 7: 10-14. FEO Moser testified that Government's Exhibit 1I is a monolithic style silencer that could function "as is" without any modification. *Id.* at 21:6-13. In fact, FEO Moser test fired a bullet through Exhibit 1I and found that the item diminished the report of a portable firearm.[3] *See* 18 U.S.C. § 921(a)(25) (the term firearm silencer means "any device for silencing, muffling, or diminishing the report of a portable firearm. . ."). Although the remaining eleven (11) silencers required slight modification to make them fully function, a silencer does not have to be fully functional to meet the statutory definition. Indeed, "any combination of parts, designed or redesigned, and ***intended for use in assembling or fabricating a firearm silencers or firearm muffler***…" is also a silencer under the law. *See* 18 U.S.C. § 921(a)(25); [DE 102 at 8-9]. As to these 11 silencers, FEO Moser explained that the features and characteristics of the items demonstrated the purchase or user's intent to modify them. These features and characteristics included pre-drilled pilot holes, which served only to demarcate where to drill to fabricate a silencer—a simple step which takes about 5-minutes. *Id.* at 20:3-13; 42:5-6. Based on the features and characteristics of the silencers, FEO Moser classified all 13 silencers recovered in this case as silencers under the statutory definition. *Id.* at 26-27:1-3.

---

[3] 1J was identical.

In addition, FEO Moser reviewed evidence from the Defendant's electronics, which further proved the Defendant's intent. Specifically, FEO Moser reviewed a section of a manual entitled The Poor Man's James Bond, located on the Defendant's computer, which, among other things, explained how to make a silencer in a home workshop. *Id.* at 40-41. In particular, the manual described how to drill holes necessary to make a functional silencer. *Id.* at 43:17-24; 44:1-17. FEO Moser also opined on the nature of the drill bit set for which the Defendant set a price alert to inform him when the price increased or decreased. FEO Moser explained the drill bit set could make the precise holes necessary to pass a bullet through. *Id.* at 43:17-24; 44:1-17. Indeed, this drill set was sold with a center punch, which is a device that assists the user in creating a further indentation in the pilot hole to assist in drilling through the silencer. *Id.* at 43: 22-24; 44: 2-17. To close, FEO Moser testified the silencers could not function efficiently, if at all, as either "solvent traps" or "fuel filters," as the Defendant claims. For example, FEO Moser testified specifically the monocore silencers would be useless as a "solvent trap" because the internal monocore would be ineffective at catching solvent. *Id.* at 32:11-17. FEO Moser also testified the 13 silencers could not function as fuel filters without modification because they did not contain a filtering component. *Id.* at 34:4-6. Furthermore, the silencers' threading was incompatible with use as a fuel filter. However, the silencers' threading could, in fact, attach to rifles found in the Defendant's home. *Id.* at 25:9-23.

As if this was not enough for the jury, the government also introduced additional evidence from the Defendant's electronics, which included a YouTube video entitled "The Cheapest Suppressor," which showed he was trying to obtain low-cost silencers like the ones in this case.[4] [DE 105 at 11 and 12]. The Defendant's electronics also revealed a manual entitled "Homemade guns and ammo," a bookmark for how to build an AR-15, and an online search for a stabilizer brace conversion

---

[4] The silencers at issue cost approximately $20. Exhibit 1 at 45: 21-23

kit, all of which demonstrated the Defendant was knowledgeable on how to modify and assemble firearms. [DE 105 at 15, 22, and 13].

Finally, the Defendant's cellphone contained a meme that mocked the length of time required to obtain the tax stamp necessary to lawfully own or modify a silencer. [DE 105 at 35A]. By way of brief background, lawfully possessing or importing a silencer requires obtaining a government tax stamp, which, as is the case with many government services or benefits, often takes a considerable amount of time acquire. *See* 27 C.F.R. § 479.112(a). The meme depicts multiple well known movie actors waiting impatiently to acquire the stamp underneath the heading "me and the boys six months into waiting for our suppressor [silencer] tax stamps." As the government argued at trial, the meme established that the Defendant knew the requirements for importing or possessing silencers, was dissatisfied with the process, and decided to create a work-around.

Notwithstanding this evidence, in a continued attempt to substantiate his claim that the silencers at issue are innocent items, the Defendant references two factually distinguishable cases that are non-binding on this Court. First, the Defendant relies on *United States v. Crooker*, 608 F.3d 94, 100 (1st Cir. 2010) for the notion that the evidence the government presented at trial was insufficient because it merely showed the so-called "fuel filters" or "solvent traps" were capable of being used as a silencer. [D.E. 115 at 4-6]. Such reliance, however, is misplaced. In *Crooker*, the subject was charged with transporting a silencer as a convicted felon after investigators seized a package containing an airgun and a black metal cylinder with a hole, baffles (silencing material), and threading which allowed it to attach to the airgun. *Id.* at 95. At trial, the government also introduce evidence of the subject's knowledge of firearms and technical skill. It also introduced an article that described how the airgun silencer could possibly be used on a real gun, but also noted that "such a device would not be a silencer because [it was] not intended for firearm use even though 'it could probably be adapted for use as a

silencer on a powder burner." *Id.* at 96. An expert also testified the device could be used as a silencer but it needed an adapter to do so. *Id.*

Interestingly based on this evidence, and over the defendant's objection, the district court in *Crooker* instructed the jury that the "government need not prove Mr. Crooker or any else actually ever used [the device] as a firearm silencer or ever intended for it to be used as a firearm silence." *Id.* The jury rendered a guilty verdict, and the defendant appealed the district court's charge to the jury. On appeal, the government supported the district court's interpretation of the statute at issue. "The government did not argue that the evidence proved that ether Crooker or the maker of the airgun silencer intended that it be used to silence a firearm, but rather that [the term] 'for'[5] d[id] not entail purpose but only knowledge and capability." *Id.* at 97. The Frist Circuit rejected that argument concluding that the jury was required to find the defendant not only knew the device was capable of being used as a silencer, but that he also intended to do so. *See id.* at 96-99. Indeed, the First Circuit stated that "the misinstruction in this case would justify a new trial, rather than acquittal, if the government had offered evidence that could allow the jury to find beyond a reasonable doubt that Crooker had the *purpose* to have the device function as a silencer," but "even on appeal the government does not claim that it could show illicit purpose." *Id.* (emphasis added). Thus, the First Circuit reversed the conviction. *Id.* at 100.

But the instant case does not suffer the same infirmity as *Crooker* because the Court properly instructed the jury as to the law, (*See* D.E. 102 at 8-0), and, at trial, the government presented ample evidence (and argued) that the Defendant intended to use the devices at issue as silencers. Specifically, the government's evidence showed that at least two of the items functioned as silencers straight out

---

[5] The term "for' here references the definition in the statute, which stated that a silencer is a device "intended for use in assembling or fabricating a silencer…." *See Crooker*, 608 F.3d at 96.

of the box, without modification. *Id.* at 21:6-11.[6] The evidence also established that the Defendant: (1) watched a YouTube video about how to obtain the cheapest silencers; (2) had a manual that instructed him on how to make silencers; (3) purchased a device that contained pre-drilled holes indicating where to drill a hole to turn the device into a silencer; and (4) set a price alert for a drill set that could make the holes that would convert the device into a silencer. Not only did the government introduce all of this evidence of the Defendant's intent, it also presented expert testimony that the devices the Defendant purchased did not (and could not) function as its purported purpose: so-called "fuel filters" or "solvent traps." This evidence is more than enough for a reasonable jury to find beyond a reasonable doubt the Defendant intended to use the devices as silencers.

Second, the Defendant's reliance on *United States v. Klebig*, 600 F.3d 700, 703 (7th Cir. 2009) is similarly unpersuasive and a non-starter. In *Klebig*, the Defendant was charged with possession of an unregistered rifle and an unregistered silencer. The issue at trial was whether *Klebig* knew the firearm under his bed had the characteristics which required it to be registered as a rifle and whether he intended to use an oil filter as a silencer. *Id.* at 703-704. As to the oil filter, *Klebig* argued he intended to use it as a flash suppressor and not a silencer, which did not require registration, so his familiarity with firearms was an issue at trial. *Id.* at 704. While the trial issues were like ours, the issues on appeal were not. The case was dismissed because the trial court admitted irrelevant evidence and the Prosecutors made improper arguments; the Seventh Circuit did not address the Defendant's intent. *Id.* at 722 As a result, the case offers no quarter for the Defendant's arguments. *Id.* at 722

Finally, the Defendant argues he never saw what was in the December 1st and December 14th packages and could not have known the items were silencers. He also contends he did not intend to use the silencers as such because (a) they could be used with an air gun, (b) they were not near or

---

[6] FEO Moser testified specifically about Exhibit 1I, which is a "monocore" silencer he test-fired and functioned "as is" without modification. Exhibit 1J was an identical "monocore" silencer.

attached to any firearm, and (c) an ATF memo recognizes other uses for the silencers. These arguments are specious. First, even though the December 1st and December 14th packages did not make it to the Defendant's house, the government introduced online orders on the Defendant's phone with photographs identical to the silencers in the packages making his denials about what was in those boxes incredulous. [DE 105 26-29]. Second, while there are devices that can be used to muffle the sound of an air gun, FEO Moser testified "generally those are labeled for air gun use only." **Ex. 1** at 57:18-22. Additionally, neither party presented evidence that the silencers in this case were compatible with air guns. Third, the proximity of the silencers to the guns in the house is of no moment. There is more than one way to intend to use a silencer. Although proximity to firearms could be an indication of a person's intent to use an item as a silencer, the law does not require a silencer to be attached to, or anywhere close to a gun to meet the statutory definition. *See* 18 U.S.C § 921(25). Lastly, the contents of any internal ATF memos/non-public information were excluded *in limine* as inadmissible because the memos are irrelevant. As the Court correctly ruled, internal ATF opinions about whether an item is or is not a silencer are not relevant to a determination of whether the Defendant here intended to use the items as silencers.

Taken together, the government introduced ample evidence for a reasonable trier of fact to conclude the Defendant intend to use the so-called "fuel filters" or "solvent traps" as silencers.

### II. The Data Extracted from the Defendant's Government iPhone was Reliable, and CFA Williams Expert Testimony Properly Admitted into Evidence.

The Defendant argues that the evidence obtained from his government iPhone is unreliable and should not have been admitted because the forensic report does not indicate if the data was viewed, and if so, when it was viewed. But these arguments speak only to the weight of the evidence, and not to its admissibility. Furthermore, the alleged inadequacies of the expert's testimony or reports were the subject of the defense's vigorous cross-examination, permitting the Jury to conclude for itself what, if any, weight to give to this evidence.

Federal Rule of Evidence 402 states that evidence is generally admissible so long as it is relevant and not otherwise prohibited by the United States Constitution, federal statute, the Federal Rules of Evidence, or other rules prescribed by the Supreme Court. Fed. R. Evid. 402 (2023). In conjunction, relevant evidence means "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. See also *Huddleston v. United States,* 485 U.S. 681, 687 (1988).

As it relates to generally reliable scientific evidence, cross-examination plays a key role in the identification of flaws in methodology and/or reports. See generally *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but **admissible** evidence."). Whatever shortcomings exist in an expert's conclusions go to the weight and not the admissibility of the testimony. *Cummings v. Standard Register Co.,* 265 F.3d 56, 65 (1st Cir. 2002)(the fact that an expert did not use or left out certain information in formulating his conclusions went to the weight of the evidence and not its admissibility). Evidence should be admitted "so long as the expert's testimony rests upon 'good grounds,' it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactory [sic] weigh its inadequacies." *In re TMI Litig.,* 193 F.3d 613, 692 (3d Cir. 1999).

The Defendant argues that the government generated a "flawed timeline" specifically in reference to governments Exhibit 32. [DE 105 at 32]. Exhibit 32 is a Cellebrite report from the Defendant's work iPhone. The report consisted of three columns (1) the content address, (2) "created, modified, accessed" (3) a photo of the content. Column two (2) labeled "created, modified, and accessed" has a date listed of January 8, 2021 and is the source of the Defendant's consternation. The

Defendant asserts the report is unreliable because the January 8, 2021 date occurred after agents seized the cellphone from the Defendant on December 18, 2020; ergo the Defendant could not have searched for anything when the phone left his possession. [DE 115 at 9]. While CFA Williams could not explain the January 8, 2021 created, modified, and access dates, he explained the content is located in the cell phones "cache." Exhibit 2, Tr. CFA Stuart Williams, page 18, lines 11-11 and 21-25. He continued "cache is a unique area on the phone, and so the phone can hit those files at any point. So, the created, modified, and access date can change. If it was an image or a photo taken from the phone the created date would be a lot more accurate." *Id.* at 18:10-17. To assist the jury in determining why the January 8, 2021 date may have appeared on the Cellebrite report, the government called the lead agent, HSI SA Eric Honig, who seized the phone and provided it to a forensic analyst at HSI on January 8, 2021. Exhibit 3, Tr. SA Eric Honig at page 3, lines 4-9.

In the same way, CFA Williams also testified about data from Facebook on the Defendant's phone, which was introduced as Exhibit 35. He similarly testified that the created, modified, and accessed date listed on the Cellebrite report corresponded to cached data and that, "there is really no way to say, yes, on this date this image was accessed because cache is in the gray area and the phone cold hit that image whenever. Exhibit 2 at 19:15-24. Although, notably, the created, modified, and accessed date on this report was listed as either December 10, 2020 or December 16, 2020—dates before the agents seized the phone on December 18, 2020. In sum, the information on the Cellebrite report and CFA Williams' testimony were properly admitted over the Defendant's objection. *Id.* at 16:6-9 ("The Court: I understand your objection. I think it goes to weight."). As the Court correctly noted, the Defendant's objections to the evidence did not bear on whether it was admissible, and the Defendant was permitted to, and did, thoroughly cross-examine the witness about these discrepancies. *Id.* ("You can ask him that – bring all of that out with the witness – and then argue to the jury well that does not sound like much of an expert to me.").

The Defendant makes an additional argument that search terms including "solvent trap," "oil filter," and "adapter," were on the Defendant's computer. The government objected when Defense counsel placed a search report on the Elmo because the report containing the search terms was not admitted in the government's case-in-chief. The Defendant contends the jury should have been able to consider the information. [DE 115 at 9 n. 4]. Agent Williams testified about the search terms, but the report with the search terms was not admitted. *See* Exhibit 2 at 7-10. Despite the Defendant's inability to display the report, he had a complete and fair opportunity to cross examine the witness on the search terms at issue. *Id.* at 23-25. The Defendant's final argument similarly fails to afford him his sought relief.

## CONCLUSION

The testimony of FEO Moser coupled with the data found on the Defendant's computer and iPhone provide more than sufficient evidence for a reasonable trier of fact to have found the Defendant intended to use the so-called "fuel filters" or "solvent traps" as silencers, especially when all reasonable inferences and credibility choices are drawn in favor of the jury's guilty verdict. In addition, the Court properly admitted the data from the Defendant's government iPhone despite alleged inaccuracies. Any alleged unreliability in the electronic data goes to the weight and not the admissibility of the evidence.

**SPACE INTENTIONALLY LEFT BLANK**

Based on the arguments and authorities set forth above the government respectfully requests that the Defendant's Rule 29 Motion be denied.

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By: _____
Stephen J. Demanovich
Assistant United States Attorney
Florida Bar No. 61120
99 Northeast 4th Street
Miami, Florida 33132
T. (305) 961-9272
Stephen.Demanovich@usdoj.gov